IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LOCAL LODGE 470 OF            )
DISTRICT 161, INTERNATIONAL   )
ASSOCIATION OF MACHINISTS     )
AND AEROSPACE WORKERS         )
AFL-CIO,                      )
                             )
          Plaintiff,          )
                             )
     vs.                      )      Civil Action No. 01-2110
                             )
PPG INDUSTRIES, INC.,         )      Judge Cercone
                             )      Magistrate Judge Hay
          Defendant.          )


REPORT AND RECOMMENDATION


I.   RECOMMENDATION

          It is respectfully recommended that defendant's motion
for summary judgment with respect to plaintiff's claims regarding
defendant's Lake Charles, Louisiana Plant (Docket No. 26) be
granted, and that plaintiff's motion for summary judgment (Docket
No. 30) be denied.

II.  REPORT

          Presently before this Court for disposition are cross-
motions for summary judgment brought by the parties with respect
to plaintiff's claims regarding defendant's Lake Charles,
Louisiana Plant ("the Lake Charles Plant").

          Plaintiff, Local lodge 470 of District 161,
International Association of Machinists and Aerospace Workers,
AFL-CIO ("the Machinists" or "the Union"), commenced this action
against defendant PPG Industries, Inc. ("PPG") under section 301

of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, after PPG notified retirees from the Lake Charles Plant in January of 2001 that it was modifying their medical benefits.[1] The Union alleges that PPG has reneged on its agreement not to reduce or terminate medical benefits for retirees and that PPG's refusal to accept and/or arbitrate the Chemical Workers grievance in this regard violates its contractual obligations under the relevant Collective Bargaining Agreements ("CBAs").

Cross-motions for summary judgment have now been filed in which the Union argues that under the broad arbitration clauses contained in the relevant CBAs PPG is obligated to arbitrate the issue of whether the benefits at issue vested and that this Court need only inquire into whether the benefits here are the type that could vest before compelling PPG to do so. As well, the Union contends that it has provided sufficient evidence to support a finding that the benefits were meant to vest so as to survive summary judgment. PPG, on the other hand, has taken the position that it has no duty to arbitrate because the

---

[1] As the Court is probably aware, there are two related cases to this one in which unions other than the Machinists have brought similar allegations against PPG for violating various CBAs negotiated by those unions on behalf of PPG employees at other plants. See United Steel Workers of America, AFL-CIO-CLC v. PPG Industries, Inc., C.A. No. 01-1601, and International Chemical Workers Union Council of the United Food and Commercial Workers Union and Its Locals 45C and 776C, C.A. No. 01-1751. A different set of motions has been filed in each of these cases which will be addressed separately.

benefits at issue had not vested while the relevant CBAs were in effect.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d

1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991),

quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

PPG initially argues that the primary issue before the
Court is whether or not the benefits at issue vested or accrued
which, in turn, will dictate whether it should be compelled to
arbitrate the instant dispute.  The Union counters arguing that
the question of whether the benefits are vested goes to the
merits of the dispute and is properly decided in arbitration and
that in order to compel arbitration the Court need only determine
that the claim at issue is the type that could be vested.  This
Court, however, has already rejected the Union's position in this
regard and has determined that before arbitration may be
compelled, the Court must first decide whether the rights at
issue, in fact, vested or accrued.

Indeed, review of the record shows that while the
Union's original motion for summary judgment was pending, PPG
filed a motion to compel discovery arguing that it needed
discovery in order to challenge the Union's position posited in
its motion that the benefits at issue vested under the relevant
CBAs.  PPG's position was that because at least some of the
agreements at issue had expired prior to the decision to reduce
benefits, the arbitration provisions contained in those
agreements were inapplicable.  Magistrate Judge Benson, who was
then presiding over the pretrial matters in this case, was
therefore put in the position of having to determine what
discovery, if any, was appropriate under Rule 26(b)(1), while

mindful of the Court's limited authority to decide the underlying issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied principally on <u>Litton Financial Printing Division v. NLRB</u>, 501 U.S. 190 (1991)("<u>Litton</u>"), which, like the instant case, involved whether disputes arising under an expired CBA are subject to the arbitration provision contained therein.  The <u>Litton</u> Court held that the presumption previously announced by the Supreme Court in <u>Nolde Brothers, Inc. v. Bakery Workers</u>, 430 U.S. 243 (1977)("<u>Nolde</u>"), that the duty to arbitrate disputes arising under an agreement outlasts the date of expiration, only applies to "disputes arising under the contract."  The Court went on to find that "postexpiration grievances can be said to arise under a contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."  <u>Litton</u>, 501 U.S. at 205-06.  Magistrate Judge Benson recognized, as other courts have, that despite the fact that the <u>Litton</u> Court expressly declined to overrule <u>Nolde</u>, the two decisions were incongruous.  Memorandum Order, Benson, M.J. (August 2, 2002) (Docket No. 13).

In an effort to resolve the apparent "tension" between <u>Litton</u> and <u>Nolde</u>, Magistrate Judge Benson took instruction from <u>Luden's Inc. v. Local Union No. 6</u>, 28 F.3d 347 (3d Cir.

1994)("Luden"), in which the Court of Appeals for the Third Circuit noted, albeit in dicta, that Litton held that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue."  Memorandum Order, p. 6, quoting Luden, 28 F.3d at 353-54 (emphasis in original). Opining that the rule set forth in Litton was the Supreme Court's latest and unequivocal statement of the law, Magistrate Judge Benson applied Litton's holding to the instant case and held that: "In this case, where post-expiration conduct is alleged to have violated a right that accrued or vested during the term of a now-expired collectively bargained agreement, the court must make inquiry into whether the right at issue actually vested or accrued while the contract was in force."  Memorandum Order, p. 7.

It therefore appears, contrary to the Union's assertion, that Magistrate Judge Benson has already determined that the Court must decide whether the benefits at issue vested or accrued prior to the expiration of the relevant CBAs which, in turn, will dictate whether the case should be subject to arbitration.  Because the district court subsequently denied the Unions' objections to Magistrate Judge Benson's Memorandum Order it now appears to be the law of the case.  See Order of Court, Ziegler, J. (October 18, 2002)(C.A. 01-1601: Docket No. 46).[2]

---

[2]      Because the various cases filed against PPG were
         consolidated at the time, it appears that the
                                              (continued...)

6

See also In re City of Philadelphia Litigation, 158 F.3d 711, 718 (3d Cir. 1998)(Finding that absent extraordinary circumstances such as the availability of new evidence, a supervening new law or where the earlier decision was clearly erroneous, the law of the case doctrine precludes the reconsideration of previously decided issues.)

The Union nevertheless suggests that because Magistrate Judge Benson stated that the Court only has to "make inquiry" into whether the right at issue actually vested or accrued, that this is somehow distinct from actually determining whether the right vested and only requires the Court determine if the right to retiree health benefits is one which they "worked toward or accumulated over time."  Union's Reply Brief, p. 5, n.6 (Docket No. 39).  We disagree.

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, see Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant arbitration provisions.  As already discussed, the holding in

---

[2]        (...continued)
district court's order was only docketed at C.A. No. 01-1601.

Litton, as quoted by Magistrate Judge Benson, states that a post-expiration grievance can be said to arise under a contract, thereby giving rise to the presumption of arbitrability, only where, inter alia, "an action taken after expiration infringes on a right that accrued or vested under the agreement." Id. at 3. It does not say that the presumption applies where the benefit at issue is one that was worked toward or accumulated over time. Further, Magistrate Judge Benson specifically stated that the issue in Litton was "whether the contractual right at issue 'vested or accrued' while the CBA was in effect." Id. He did not interpret the issue as being whether the contractual right at issue was worked toward or accumulated over time. Indeed, contrary to the Union's suggestion, the Litton majority did not merely find that the right to have seniority considered in making layoffs was not the type of claim that could be vested but, as noted by Magistrate Judge Benson, it found that the right had, in fact, not vested or accrued prior to the expiration of the contract. Id. at 4.

Moreover, Magistrate Judge Benson clearly relied on the Third Circuit's findings in Luden, which describes Litton as holding that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue." Id. at 6. The Luden Court did not find, nor did Magistrate Judge Benson, that Litton stood for the proposition that the Court is precluded from reaching the merits of the underlying dispute or

8

that the Court need only determine if the right at issue was worked toward or accumulated over time.

Finally, following Magistrate Judge Benson's statement that "the Court must 'make inquiry' into whether the right at issue actually vested or accrued while the contract was in force," he described his findings as requiring the court to address the merits of the issue.[3]  Under these circumstances, the Union's suggestion that the Court need not address the merits of the dispute or to determine whether the benefits at issue here actually vested is not only without merit but is contrary to the law of the case.

The Court of Appeals for the Third Circuit has recognized that under ERISA there are two types of employee benefit plans: employee welfare plans, which are at issue here, and employee pension plans.  <u>International Union, United Authomobiule, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co.</u>, 188 F.3d 130, 137 (3d Cir. 1999)("<u>Skinner</u>").  Although pension plans have elaborate vesting requirements under ERISA, it does not require automatic vesting of welfare benefit plans.  <u>Id</u>.  As the Third Circuit has explained, the difference was not accidental, but, rather, a

---

[3]	Specifically, Magistrate Judge Benson stated that, "To say, however, that in this case the court must address the merits of the issue, and, hence, that the parties are permitted to conduct discovery, is not to answer the precise question before the court: exactly <u>what</u> discovery is proper?"  Memorandum Order, p. 7.

recognition by Congress that employers need some flexibility
regarding their right to alter medical plans due to the fact that
the "'costs of such plans are subject to fluctuating and
unpredictable variables'" such as "'inflation, changes in medical
practice and technology, and increases in the cost of treatment
independent of inflation.'" Id. at 138, quoting Moore v.
Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a
welfare plan may provide a vested benefit." In Re Unisys Corp.
Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 902 (3d
Cir. 1995)("Unisys"). See Skinner, 188 F.3d at 138. It is the
plan participant's burden to prove, by a preponderance of the
evidence, that the employer intended the welfare benefits to vest
for life. Id. at 138-39. The Court of Appeals for the Third
Circuit, however, has cautioned that:

> to vest benefits is to render them forever
> unalterable. Because vesting of welfare
> benefit plans constitutes an extra-ERISA
> commitment, an employer's commitment to vest
> such benefits is not to be inferred lightly
> and must be stated in clear and express
> language.
>
> *          *          *
>
> These cautionary principles apply without
> regard as to whether the employee welfare
> benefits are provided under a collective
> bargaining agreement, SPD [summary plan
> description], or other plan document; the
> same underlying considerations are present
> irrespective of the particular type of
> document at issue.

Id. at 139. See Unisys, 58 F.3d at 902 ("[A]ny retiree's right
to a lifetime medical benefit under a plan can only be found if

established by the terms of the ERISA-governed employee benefit plan .... A court must examine the plan documents.")

It also appears undisputed that while collective bargaining agreements are generally governed by federal law, traditional rules of contract construction apply when not inconsistent with federal labor law.  <u>See</u> <u>Skinner</u>, 188 F.3d at 138.  Moreover, how a plan document or CBA should be interpreted is typically a question of law and where a CBA is clear and unambiguous, its meaning must be determined as a matter of law. <u>Id</u>.

In the instant case, it appears undisputed that PPG and the Machinists have had a collective bargaining relationship since October 1, 1961.  Stipulation of Undisputed Facts, ¶1.[4] <u>See</u> PPG Exh. 10: 10/1/61 CBA Cover Page.[5]  It also appears undisputed that prior to the expiration of each CBA, the parties would negotiate a successor CBA, setting forth any changes that were to be included therein in a Memorandum of Agreement ("MOA").  Stipulation of Undisputed Facts, ¶5.  The MOA also included any changes to the substantive provisions of the health insurance program for PPG's active and retired employees which were ultimately set forth in a separate plan booklet entitled Group Insurance Plan or Group Benefits Plan ("GIP").  Statement of

---

[4]        The Stipulation of Undisputed Facts which have been submitted by both parties appear at Docket Nos. 29 and 32.

[5]        Unless otherwise indicated PPG's Exhibits appear at Docket No. 28.

Undisputed Facts, ¶6.  The first reference in a CBA to a health insurance program for employees appears to have been contained in the October 1, 1971 CBA, which provided that:

> **Section 1.**  The Company agrees to provide for all eligible employees a benefit program which will include the following plans:
>
> \*       \*       \*
>
> (c)  Hospitalization Insurance, including surgical, medical, and major medical coverage.

Stipulation of Undisputed Facts, ¶8.  See PPG Exh. 2: 10/1/71 CBA, Article XVII, p. 21 (Emphasis in original).  It also appears that every CBA since then has contained substantially the same language.  Id.

As well, it appears that the October 1, 1963 GIP was the first document to provide for benefits upon retirement.  It states:

> After retirement your insurance will continue until the end of the month in which retirement occurs and thereafter your insurance and contributions toward such insurance will be in accordance with the Plan of Insurance applicable to retired employees.

PPG Exh. 3: 10/1/63 GIP, p. 28; PPG Exh. 20: Logan Aff. ¶9.  See Stipulation of Undisputed Facts, ¶15.  The October 1, 1963 GIP goes on to describe the hospital, surgical and medical expense benefits for retired employees in a subsequent paragraph.  PPG Exh. 3: 10/1/63 GIP, p. 29.

It also appears undisputed that the first GIP to provide for the continuation of active insurance into retirement is the March 1, 1975 GIP.  Specifically, it provides that:

Retirement

11.7      At the time you retire under the Pension Agreement,
the following provisions will be applicable to your
coverage under the Program:

*      *      *

(c)  Medical Care Benefits and Major Medical
Expense Insurance.

Such coverage provided enrollment is in effect,
will be continued in effect thereafter subject to
the provisions in paragraphs 2.2, 3.2 and 3.3, but
will be reduced by any benefits provided by
Medicare pursuant to paragraph 10.12.

See Stipulation of Undisputed Facts, ¶15.   See also PPG Exh. 4:

3/1/75 GIP, §11.7, p. 38; PPG Exh. 20: Logan Aff. ¶10.   Each

succeeding GIP, it appears, contains this provision as well.   Id.

PPG argues that there is not only no clear and express

language in any of the plan documents governing the Lake Charles

Plant which would indicate a commitment by PPG to vest retiree

medical benefits but that the language that is contained in the

documents expressly limits PPG's obligation in this respect for

the duration of the CBA.  Specifically, PPG points to the fact

that each CBA since October 1, 1971, contains a termination

provision, which states that:

Section 1.   This Agreement shall become
effective October 1, 1971, and shall remain
in full force and effect until 12:01 A.M.
June 1, 1973, and from year to year
thereafter unless either party desires to
modify or terminate the Agreement and files a
notice in writing of its desire to so
terminate or modify at least sixty (60) prior
to 12:01 A.M. June 1, 1973, or prior to 12:01
A.M. on June 1 of any subsequent year.

*      *      *

13

> Section 2.    This Agreement constitutes a
> complete and final settlement of all demands
> of both parties, and, further, in
> consideration of the benefits granted herein,
> the Union hereby expressly waives any right
> to request that the Company bargain with the
> Union or with employees represented by the
> Union during the life of this Agreement, with
> respect to any economic or  non-economic
> demands or with respect to any question of
> wages, hours or other terms or conditions of
> employment.

PPG Exh. 2: 10/1/71 CBA, Article XXIV, p. 30 (Emphasis in

original); Stipulation of Undisputed Facts, ¶14.  See PPG Exh.

20: Logan Aff. ¶ 8.

Moreover, it appears undisputed that since 1987, each

of the GIPs also contains language that its obligation to provide

retiree medical benefits was limited to the duration of the CBA

then in effect.  Indeed, the May 15, 1987 GIP provides that:

> The Company will continue the benefits
> described herein for active and retired
> employees consistent with the terms and
> conditions of the labor agreement for the
> duration of such agreement.... In the event
> of termination of the labor agreement, you
> have the same rights as to claim submission
> and review and conversion rights as you would
> have under individual termination of
> coverage.

PPG Exh. 1: 5/15/87 GIP, p. 5.  See PPG Exh. 20: Logan Aff. ¶ 5.

Under these terms, PPG submits, it maintained the right to modify

or terminate such benefits following the expiration of the CBA.

The Union does not dispute that these provisions are

contained in the relevant plan documents pertaining to the Lake

Charles Plant, nor does it point to any clear and express

language in the plan documents which would suggest that PPG

intended for retiree medical benefits to vest.  Rather, the Union contends that a "common sense" reading of the CBAs indicates that retiree medical benefits are vested and that, in the alternative, the CBAs and GIPs are ambiguous thereby requiring a fact finder to decide the issue.

To support its position that the CBAs indicate on their face that retirement benefits were intended to vest on their face, the Union relies principally on language in the 1987 MOA regarding Hospital and Medical Benefits, which provides that:

> Effective May 15, 1987, [PPG will] provide continued hospital insurance coverage for the surviving spouse of a retiree who retires on a Normal or Disability Pension on or after May 15, 1987, until death or remarriage, at the spouse premium contribution rate.

Union App. 201, ¶4.[6]  The Union also refers to the 1996, 2000 and 2003 GIPs which provide, in substantially similar language, that:

> The surviving spouse and eligible dependents of a deceased active employee who has attained retirement eligibility shall be eligible to continue coverage for Medical Care Benefits, Major Medical Expense Benefits, Prescription Drug benefits and Dental Benefits until the spouse's remarriage or death by timely paying the required contribution applicable to active employees. Eligible dependent children shall be covered until they cease to be eligible dependents as defined in the program.

Union App. 342, 385, 434.  The Union, pointing to the phrase "until death," contends that it would be nonsensical for the Union to have secured lifetime benefits for the spouses of

---

[6]     The Union's Appendix has been filed at Docket No. 33.

retirees but not for the retirees themselves thereby requiring a finding that medical benefits for retirees vested as well.

The difficulty with the Union's position, as its own argument appears to acknowledge, is that whether or not an intent to vest could be inferred from various provisions in the plan documents is not the test.  Rather, it is the Union's burden to point to clear and express language indicating an employer's commitment to vest.  Skinner, 188 F.3d at 138-39.  Clearly the provisions relied upon by the Union do not contain such clear and express language and, thus, do not provide the basis for finding the plan documents confer vested benefits upon retirees.[7]  This is particularly true here where the express language that is contained in the GIPs since 1987 limits the duration of benefits provided for therein to the term of the CBA.  PPG Exh. 1: 5/15/87 GIP, p. 5.

Nor does it appear that these provisions provide the basis for finding the plan documents ambiguous.  Indeed, it does not appear that the MOAs are not part of the plan documents at all and the "until death" language is notably absent from the

_____

[7]     We note here that in its brief in opposition to PPG's motion for summary judgment the Union has cited to several other provisions in GIPs suggesting that they, too, evidence an intent to vest retiree benefits.  See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 5-8 (Docket No. 37).  These provisions, however, are equally devoid of clear and express language indicating PPG's commitment to vest these benefits and, thus, have only been discussed to the extent they may suggest that the plan documents are ambiguous.

16

corresponding 1987 GIP which governs the benefits at issue.  <u>See</u>
Stipulation of Undisputed Facts, ¶7; Union Exh. 246, p. 60-61.

The Union nevertheless argues that because the MOAs are
the product of the parties' negotiations and reflect the changes
agreed upon they should be considered part of the plan documents
and, having been drafted by PPG, should be construed against it.
While it cannot be disputed that MOAs were the product of
negotiations between the parties and that they purport to reflect
the agreed upon changes, <u>see</u> Stipulation of Undisputed Facts ¶¶5,
8, it is also clear that they merely contain summaries of the
health insurance program and that plan itself is set forth in the
GIPs and incorporated into the CBAs.  <u>Cf.</u> Union App. 198-208 with
Union App. 215-253.  Indeed, it appears undisputed that the CBAs
and GIPs are given to the Union to ensure that they, as the
governing documents, reflect the negotiated changes.  <u>See</u> PPG
Exh. 20: Logan Aff. ¶6; PPG Exh. 14: Taylor Depo., pp. 155-57.
The Union apparently did not object to the absence of the "until
death" phrase when it reviewed the 1987 GIP and, indeed,
apparently did not require its inclusion during subsequent
negotiations.  <u>See</u> Union App. 261.

Further, PPG has represented, and the Union does not
dispute, that each CBA since 1961 contains an integration clause
stating that, "This Agreement constitutes a complete and final
settlement of all demands of both parties."  Union App. 21.  <u>See</u>
PPG Exh. 1: Jordan Aff. ¶7 (Docket No. 36).  "Where the parties
to an agreement adopt a writing as the final and complete

17

expression of their agreement, as here, evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreement." McGuire v. Schneider, Inc., 368 Pa. Super. 344, 348, 534 A.2d 115, 118 (1987).  It therefore appears that the CBAs and GIPs constitute the plan documents and that the Union's reliance on the 1987 MOA is misplaced.

Similarly, it does not appear that the Union's reference to subsequent GIPs providing for benefits for surviving spouses and eligible dependents until the spouse's remarriage or death provides the basis for finding the plan documents are ambiguous as those provisions do not pertain to surviving spouses of retired employees at all.  Rather, as argued by PPG, these provisions pertain to the spouses and dependents of deceased *active* employees who have attained retirement eligibility but have not yet retired.  See Union App. 342, 385, 434.  Indeed, the very next paragraph sets forth the provisions applicable to the spouse and dependents of *retired* employees and states only that they are "eligible to remain in the program until the widowed spouse's remarriage."  Union App. 342, 385, 434.  Thus, it does not appear that the language providing for benefits "until death" is relevant.

Moreover, even if the "until death" reference were included in the provisions pertaining to retired employees it does not follow that the benefit vests for life given the duration clause which, as previously discussed, provides for

18

benefits for the duration of the CBA.  PPG Exh. 1: 5/15/87 GIP,
p. 5.  Thus, it appears that the provision providing for benefits
until death is subject to renegotiation at the expiration of the
CBA just like any other provision.  The fact that the term for
which benefits are being offered here is not for a finite period
of time does not appear to alter that fact.

        In this manner it appears that <u>Bidlack v. Wheelabrator
Corp.</u>, 993 F.2d 603 (7th Cir.), <u>cert.</u> <u>denied</u>, 510 U.S. 909
(1993), upon which the Union relies, is easily distinguishable
from the instant case.  In <u>Bidlack</u>, the Court found that the
clause providing for health insurance at the company's expense
once retired employees reached the age of 65 and which would
continue for their spouse upon their death was vague thereby
rendering the CBA ambiguous.  In so finding, the Court relied on
the fact that the provision did not say "when they die or when
the collective bargaining agreement expires, which ever comes
first."  In this manner the Court found the facts before it
distinguishable from the facts in its earlier decision in <u>Senn v.
United Dominion Industries, Inc.</u>, 951 F.2d 806 (7th Cir. 1992),
<u>cert.</u> <u>denied</u>, 509 U.S. 903 (1993)("<u>Senn</u>"), in which the Court
found that the CBAs and plan documents at issue in that case
unambiguously did not provide for vestment of lifetime benefits
because they included a clause stating "that coverage 'shall be
continued *during the term of this Agreement.*'".  <u>Id.</u> at 608,
quoting <u>Senn</u>, 951 F.2d at 810, 815 (Emphasis in original).

Here, the duration clause contained in the relevant GIPs expressly includes the language that the <u>Bidlack</u> Court found lacking and which the Court in <u>Senn</u> found precluded a finding that retiree welfare benefits survived the expiration of the CBA. Thus, not only does <u>Bidlack</u> not provide the basis for finding the present GIPs ambiguous, it appears to support the opposite conclusion.  As such, it appears that the provision providing for surviving spouse benefits, when read in conjunction with the duration clause, ise not ambiguous but merely permits the surviving spouse to continue receiving benefits until the CBA expires and/or is renegotiated.  <u>Id.</u>  See <u>Rossetto v. Pabst Brewing Co.</u>, 217 F.3d 539, 547 (7th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1192 (2001)("If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as 'during the term of this agreement,' then ... the plaintiff loses as a matter of law ....").  See <u>also</u> <u>Skinner</u>, 188 F.3d at 141.

Nor do the other provisions cited by Union appear to suggest that the plan documents are ambiguous.  Indeed, the Union has largely failed to present any argument in this regard but, rather, has merely quoted the provisions and concludes that they render the GIPs ambiguous.  See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 5-8 (Docket No. 37).  Presumably the Court is to infer the alleged ambiguity from the fact that the provisions contain phrases such as "lifetime," "will continue" and "death of an employee."  These post-

expiration terms, however, cannot be said to "arise under a contract" that has expired or provide for vested benefits merely because the contract would have applied to those matters had it not expired.  <u>Litton</u>, 501 U.S. at 206.  As found by the Court in <u>Litton</u>, a contrary interpretation "fails to recognize that an expired contract has by its own terms released all its parties from their respective contractual obligations."  <u>Id.</u>

In this manner, the fact that the 1987 GIP's provision for Major Medical Expense Insurance caps the maximum benefit "per lifetime" to a certain dollar amount does not appear to suggest that employees are entitled to that benefit in perpetuity.  <u>See</u> Union App. 223.  Indeed, the provision does not appear to speak to the duration of the benefit at all but rather appears to say only that there is a limit to coverage regardless of duration. Moreover, there is nothing about this language which is inconsistent with the GIPs duration clause or which would suggest that the provision is not subject to renegotiation after the 1987 CBAs and GIPs expire.

The Union also cites to the following provision contained in the 1987, 1996 and 2000 GIPs as providing the basis finding that the GIPs are ambiguous:

> All coverage other than Medical Care
> Benefits, Major Medical Expense Insurance and
> dental Expense Insurance ceases as of the
> date of death of an insured employee.
> Medical Care Benefits, Major Medical Expense
> Insurance and Dental Expense Insurance ceases
> on the last day of the month in which death
> occurs.

Union App. 246, 342, 385.  This provision, however, appears in a section dealing with the death of actives employees, not retired employees, and does not, indeed, cannot provide for vested benefits.  Moreover, the provision appears merely to describe the limits on these benefits in the event an active employee dies during the term of the governing CBA and GIP which is not only consistent with the duration clause but is subject to change as successive CBAs and GIPs are negotiated.

The Union also points to § 2.2 of the 1987 GIP which states that, "When you retire under the Pension Agreement you will continue to be insured under the Program as modified for retirees, provided you enroll for it and timely pay the required contributions."  Union App. 224.  Having highlighted the "will continue" language, the Union appears to suggest that it was agreed that benefits would continue in perpetuity.  The Court of Appeals for the Third Circuit, however, has specifically rejected the notion that under these circumstances the phrase "will continue" in describing medical benefits is ambiguous.  To the contrary, in assessing a series of CBAs containing the same "will continue" language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly and expressly indicate vesting since there is simply no durational language to qualify these phrases.  That is, the CBAs do not state that retiree benefits "will continue for the life of the retiree," or that they "shall remain unalterable for the life of the retiree."  An equally reasonable interpretation is that the benefits "will continue until the CBA expires," or that they "shall remain ... until the CBA expires."  Indeed, the latter interpretation appears to

22

> be the more reasonable in light of the
> durational provisions in all of the CBAs.
> Section 46 of the 1986-1989 CBA is
> illustrative: "This Agreement represents a
> complete resolution of all non economic items
> and shall, in all of its terms, remain in
> effect from July 1, 1986 until midnight, June
> 30, 1989 ...." Read in conjunction with the
> durational clauses, the phrases could be
> interpreted to mean, for instance, that the
> medical benefits "will continue until
> midnight of June 30, 1989."
>
> *          *          *
>
> The phrases, "will continue" and "shall
> remain," as discussed above, are simply not
> susceptible to more than one reasonable
> interpretation, and they do not somehow
> render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

The Union lastly suggests that an ambiguity in the plan documents is evident from the fact that Appendix E to the 1987 GIP which sets forth the Retiree Group Medical Expense Program states that, "The purpose of the Plan is to augment federal Medicare insurance so that the total benefits for which you are eligible will be equivalent to active employee Medical Care benefits and Major Medical Expense Insurance coverage." Union App. 252. While the parties may have negotiated a plan in 1987 to augment federal Medicare insurance so as to give retirees benefits on par with active employees, there is nothing about this language that suggests a commitment by PPG to do so in perpetuity. Indeed, this appears particularly true in light of the duration clause.

Finally, the Union argues that the duration clause cannot be read to limit the duration of retiree health benefits

23

in the GIP because it only contains general durational language and is not specific as to retiree health benefits and that the clause would render the other benefit provisions in the GIPs illusory if PPG could terminate them upon expiration of the CBA. The Union also suggests that because PPG unilaterally inserted the clause in the 1987 CBA it is ineffective.

The Union's argument appears to be without merit as the duration clause specifically refers to retiree benefits stating that, "The Company will continue the benefits described herein for active and retired employees consistent with the terms and conditions of the labor agreement for the duration of such agreement."  PPG Exh. 1: 1987 GIP, p.5.  Moreover, to the extent that the individual provisions pertaining to benefits for retired employees are silent regarding duration that fact does not suggest that those benefits are unalterably vested.  Indeed, in Skinner, the Court specifically found that "[s]ilence on duration ... may not be interpreted as an agreement to vest retiree benefits in perpetuity."  Skinner, 188 F.3d at 147.  Thus, the absence of durational language in the context of each benefit being provided does not provide the basis for ignoring the clause limiting the benefits for retired employees as set forth in the GIPs to the duration of the labor agreement.

Nor does the fact that other benefit provisions contain durational language appear to alter that conclusion. Specifically, the Union points to the Retirement provision of the 1987 GIP which provides:

> At the time you retire under the Pension Agreement, the following provisions will be applicable to your coverage under the Program:

> \*     \*     \*

> (b) Accidental Death and Disfigurement Insurance and Accident Sickness Insurance.

> Such coverage will terminate on the last date of active work and may not be converted.

> \*     \*     \*

> (d) Dental Expense Insurance.

> Such coverage will terminate on the last day of active work and may not be converted.

Union App. 246. Because these provisions evidence that PPG understood how to draft durational limitations on benefits offered to retirees, the Union argues that its failure to do so with other benefits somehow renders the duration clause that is contained in the GIPs inapplicable.

The termination language in these provisions, however, indicates that coverage is to end upon retirement, regardless of the duration of the CBA, and does not serve to limit the duration of benefits enjoyed during retirement as is at issue here.

The Union nevertheless argues that limiting the benefits provided for in the GIPs to the duration of the CBA somehow renders the provision of benefits illusory since, "if PPG could terminate every benefit at the expiration of the CBA, those provisions that provide any benefit into the future would be of no use to IAM employees." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 11-12 (Docket No. 37). By way of example, the Union refers to section 12.0 of the

25

1987 GIP which provides that if an employee ceases active work because of a non-occupational disability he is entitled to, for instance, the full amount of life insurance, accidental death and dismemberment insurance for a period of 39 weeks following the month in which the employee ceased active work.  Union App. 242. The Union then argues that this promise to make payments for 39 weeks does the employee who becomes disabled one week before the contract expires no good, suggesting that he would only be entitled to one week of benefits rather that the 39.

     The Union's argument is without merit.  The employee who becomes disabled one week before the contract expires would still be entitled to the benefits as provided for under the contract, i.e., 39 weeks of disability, since that is the benefit provided for under the contract in effect when he ceased active work.  The duration clause merely limits the availability of the 39 weeks of, say, life insurance to the those employees who become disabled while the contract is in effect leaving the door open to have that benefit renegotiated when the CBA expires. Indeed, the next CBA could provide for 40 weeks of life insurance or more or less.  Thus, there is nothing illusory about providing benefits, as then negotiated, for the duration of the agreement or until such time as they are to be renegotiated.

     Nor do the cases relied upon by the Union to support its position compel a different result.  Although in United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093, 1100-01 (M.D. Tenn. 1994)

("Pirelli"), the Court found that the employer's reliance on a general durational clause to terminate certain retiree Medicare benefits at the expiration of the CBA rendered the promise to pay certain Medicare payments illusory to those retirees not yet eligible for Medicare, it so found having first accepted the presumption set forth in International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), cert. denied, 465 U.S. 1007 (1984)("Yard-Man"), that retiree welfare benefits were intended to vest.  The Court of Appeals for the Third Circuit, however, has specifically declined to adopt what has been termed the "Yard-Man presumption" or Yard-Man's interpretation of the relevant contract language.  Skinner, 188 F.3d at 139, 140, 141. In fact, the Third Circuit subsequently described its opinion in Skinner as creating a presumption against vesting with respect to welfare benefit plans.  Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan, 298 F.3d 191, 196 (3d Cir. 2002).  Thus, it appears that the Union's reliance on Pirelli is misplaced and does not provide the basis for ignoring the duration clause.

        Indeed, proceeding under the presumption that such benefits were not intended to vest, as we must, the presence of a duration clause does not render the promise of making payments in the future illusory but, rather, merely indicates that it is only applicable to those employees who reach eligibility during the

life of the CBA and that the provision will have to be
renegotiated when the CBA expires.

The Union's reliance on In re New Valley Corp., 89 F.3d
143 (3d Cir. 1996), cert. denied, 519 U.S. 1110 (1997), also
appears to be misplaced as that case involved executive deferred
compensation plans and not welfare plans as are at issue here.
Indeed, the Court specifically found that "the special nature of
top hat plans distinguishes this case from prior decisions in
which we have held a clause reserving the right to terminate or
amend unambiguous and controlling." Id. at 146.  Moreover, the
Court expressly limited its holding to the facts of the case
before it.  Id.  Under these circumstances, In re New Valley
Corp., cannot provide the basis for finding the duration clause
at issue here is inapplicable to retiree welfare benefits.

Finally, although the Union takes issue with PPG's
reliance on Maurer v. Joy Technologies, Inc., 212 F.3d 907 (6th
Cir. 2002)("Maurer"), it is the Union's argument that appears
largely misplaced.  PPG has not cited Maurer for the proposition
that a duration clause trumps other language in the CBA
indicating that benefits were intended to vest.  Thus, the
Union's attempt to distinguish Maurer on the basis that it
involved a "reservation of rights" clause rather than a duration
clause and its argument that other courts have held that
reservation of rights clauses do not invariably trump other
vesting language in CBAs is of little consequence.

It does appear, however, that PPG has cited <u>Maurer</u> for the proposition that the Union's failure to object to the inclusion of the duration clause at anytime prior to the litigation, even though it had been included in the GIPs since 1987, should preclude it from challenging its insertion or applicability now.  <u>See</u> <u>Maurer</u>, 212 F.3d at 919 (Finding that the union was precluded from arguing that the plaintiffs' retirement benefits vested in light of the reservation of rights clause that, while unilaterally inserted by the company, was conspicuously contained in the insurance booklet and remained uncontested for three years.)  Notably, although the Union cites to the fact that PPG Union unilaterally inserted the duration clause in the 1987 GIP, it does not expressly object to its having done so.  Rather, the Union merely argues that <u>Maurer</u> in this respect is at odds with <u>Delgrosso v. Spang & Co.</u>, 769 F.2d 928, 935-36 (3d Cir. 1985), <u>cert.</u> <u>denied</u>, 476 U.S. 1140 (1986) ("<u>Delgrosso</u>"), in which, according to the Union, it was found that "where an employer unilaterally inserted language into an ERISA document that had been the product of negotiations with a union, the language was 'ineffective.'"  Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 14-15 (Docket No. 37).  It does not appear, however, that the holding in <u>Delgrosso</u>, is quite as broad as the Union has suggested nor is its applicability to the instant case quite so apparent.

Indeed, in <u>Delgrosso</u>, at issue were the surplus assets of a pension fund which Spang, the employer, sought to

appropriate under the provisions of a new pension plan that it
unilaterally drafted while the previous pension plan was still in
effect.  The new plan eliminated the clause which prohibited any
reversion to Spang of its contributions to the Plan and
introduced a provision which specifically provided for reversion
to Spang any surplus of assets.  Observing that the Pension
Agreement specifically precluded any change in terms during the
duration of the Agreement and that Spang was obligated to
administer the Plan according to the Agreement, which included
the provision that "contributions made by the Company hereunder
may not, under any circumstances, revert to the Company," the
Court found that any plan providing for the reversion of Plan
assets to Spang was not in accordance with Plan documents and
that "any Plan provision so providing was ineffective."  Id. at
935-36.  Thus, the Court's decision in Delgrosso, turned not so
much on the fact that Spang unilaterally modified the Agreement
but that the change, which itself violated the Plan, ran afoul of
the proviso precluding changes to the plan documents while the
Agreement was still in effect.

      Here, it does not appear that PPG included the duration
clause while a CBA was in effect but did so when the 1987 CBA and
GIPs were drafted.  Nor does the inclusion of the duration clause
in and of itself violate the terms of the CBA as there does not
appear to be a clause stating the PPG is precluded from limiting
the duration of the agreement.  Most important to this
discussion, however, is that the Union has cited Delgrosso as

being in conflict with <u>Maurer</u>, which PPG has cited to support its position that because the Union failed to challenge the duration clause when it was inserted it has waived the right to do so now. <u>Delgrosso</u>, however, does not speak to the issue of waiver nor is there any evidence in that case that the plan participant failed to challenge Spang's amendment when it was made.  Thus, it does not appear that <u>Delgrosso</u> is in conflict with <u>Maurer</u> in this regard and does not provide the basis for disregarding its counsel on waiver.

This having been said, it is undisputed that the duration clause at issue here has been included in every GIP since 1987 and that the Union was given the GIPs to review.  <u>See</u> PPG Exh. 20: Logan Aff. ¶6; PPG Exh. 14: Taylor Depo., pp. 155-57.  Indeed, the Union has not argued that it failed to review the GIPs containing the clause or was otherwise unaware of it.  Yet, it appears undisputed that the Union has never objected to the inclusion of the clause and, in fact, agreed in 1996 to have it highlighted under the heading "Notice to Employees."  <u>See</u> PPG Exh. 20: Logan Aff. ¶¶5, 6; Union App. 326, 370, 412.  Thus, to the extent that the Union objects to the insertion of the clause, which it has not expressly done, it has not provided the Court with a basis for disregarding <u>Maurer</u> or for finding that the duration clause is "ineffective."

It therefore appears that the plan documents pertaining to the Lake Charles Plant are not only devoid of clear and express language indicating PPG's intent to vest retiree welfare

benefits, but they are without ambiguity, thereby precluding a
finding that PPG intended for retiree medical benefits to vest.[8]
As such, the grievance which the Union seeks to arbitrate cannot
be said to arise under the contract and, thus, PPG cannot be
compelled to arbitrate under the expired CBAs. <u>Litton</u>, <u>supra</u>.

---

[8]        Having so found, we reiterate here that it is the
plan documents that control and which the Court
must assess to determine whether the right to
lifetime benefits has been established. <u>Unisys</u>,
58 F.3d at 902.  While we are mindful of the fact
that extrinsic evidence may be used to determine
whether an ambiguity exists in a plan document,
it may not be used to create an ambiguity where
none exists. <u>See</u> <u>Skinner</u>, 188 F.3d at 145.
Indeed, quoting from <u>Bidlack v. Wheelabrator
Corp.</u>, 993 F.2d at 608, the Court in <u>Skinner</u>
opined that before extrinsic evidence should be
considered, "there must be either contractual
language on which to hang the label of ambiguous
or some yawning void ... that cries out for an
implied term.  Extrinsic evidence should not be
used to add terms to a contract that is plausibly
complete without them." <u>Skinner</u>, 188 F.3d at
146.  Because it appears that no ambiguity exists
in the plan documents at issue here we have not
considered the extrinsic evidence submitted by
the Union.  It should nevertheless be noted that
the evidence submitted by the Union consists
largely of documents other than plan documents
and testimony from Union members that benefits
were meant to vest or statements allegedly made
to them by PPG representatives to the same
effect.  The Court of Appeals for the Third
Circuit has held, however, that neither
testimonies of union members as to their belief
regarding the duration of retirement benefits nor
an employer's oral undertakings serve to modify
the written terms contained in plan documents
that are otherwise complete. <u>Skinner</u>, 188 F.3d
at 145-147. <u>See</u> <u>Depenbrock v. CIGNA Corp.</u>, 389
F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that
all employee benefit plans be established and
maintained pursuant to a written instrument and
precludes oral or informal amendments.)  It
therefore appears that even if the Court were to
consider the Union's extrinsic evidence it would
not compel a different result.

For these reasons, it is recommended that defendant's motion for summary judgment with respect to plaintiff's claims regarding defendant's Lake Charles, Louisiana Plant (Docket No. 26) be granted, and that plaintiff's motion for summary judgment (Docket No. 30) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge


Dated:    30 September, 2005.


cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor
     Pittsburgh, PA 15219

     Sally M. Tedrow, Esquire
     O'Donoughe & O'Donoughe
     4748 Wisconsin Avenue, NW
     Washington, DC 20016

     Richard J. Antonelli, Esquire
     Spilman Thomas & Battle, PLLC
     One Oxford Centre, Suite 3440
     301 Grant Street
     Pittsburgh, PA 15219

Melvin P. Stein, Esquire
United Steel Workers of America
Five Gateway Center
Room 807
Pittsburgh, PA 15222
William T. Payne, Esquire
Schwartz. Steinsapir, Dohrmann & Sommers
1007 Mt. Royal Boulevard
Pittsburgh, PA 15223

John E. Stember, Esquire
Edward J. Feinstein, Esquire
Pamina Ewing, Esquire
Stephen M. Pincus, Esquire
Stember Feinstein Krakoff
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219